# <u>EXHIBIT 2</u>

```
 1              IN THE DISTRICT COURT OF THE UNITED STATES

 2                FOR THE EASTERN DISTRICT OF MICHIGAN

 3

 4

 5   FARM BUREAU MUTUAL INSURANCE

 6   COMPANY OF MICHIGAN, a Michigan

 7   Corporation, a/s/o New Flevo

 8   Dairy, Inc.,

 9                    Plaintiff,

10        vs.                      Case No. 2:17-cv-14044-BAF-EAS

11

12

13   CNH INDUSTRIAL AMERICA, LLC

14   D/B/A NEW HOLLAND AGRICULTURE,

15   a Wisconsin Corporation,

16                    Defendant.

17   _____

18

19

20        The Deposition of JERRY DAHL, P.E.,

21        Taken at 217 Grandville Avenue, S.W., Suite 302,

22        Grand Rapids, Michigan,

23        Commencing at 9:30 a.m.,

24        Tuesday, August 21, 2018,

25        Before Rebecca L. Russo, CSR-2759, RMR, CRR.
```

| | | |
|---|---|---|
| 1 | A. | It does great things for people. |
| 2 | Q. | Okay, in what way? |
| 3 | A. | They provide a variety of engineering services, civil |
| 4 | | engineering services, land planning development, |
| 5 | | surveying, and the segment I'm involved with, forensic |
| 6 | | engineering and fire investigation. |
| 7 | Q. | When you say "forensic engineering and fire |
| 8 | | investigation," does that involve litigation |
| 9 | | consultation? |
| 10 | A. | It can. |
| 11 | Q. | What percentage of your practice involves litigation |
| 12 | | work? |
| 13 | A. | I don't have a good answer. |
| 14 | Q. | Is it more than half? |
| 15 | A. | I don't believe so. |
| 16 | Q. | The half that does not -- well, let me rephrase that. |
| 17 | | The portion of your practice that does not |
| 18 | | involve litigation, describe for me what it is that |
| 19 | | you do. |
| 20 | A. | We would be contacted by a client, individual, |
| 21 | | business owner, insurance company, attorney, to |
| 22 | | investigate a loss, damage, accident, fire, injury, |
| 23 | | and to render an opinion in terms of failure, fault, |
| 24 | | causation.  Typically a report is issued, and that |
| 25 | | wraps up our investigation. |

DAHL, P.E., JERRY
08/21/2018                                                    Page 24

```
 1   Q.   Have you ever been retained by Farm Bureau before this
 2        case?
 3   A.   Yes.
 4   Q.   Do you have a number, say, more than ten times you've
 5        been retained by Farm Bureau?
 6   A.   Yes.
 7   Q.   Would it be more than fifty times?
 8   A.   I don't know.
 9   Q.   What's the highest level of education you've achieved?
10   A.   I have a master's degree of mechanical engineering
11        from Washington University, in St. Louis.
12   Q.   What year did you obtain that master's?
13   A.   1983.
14   Q.   Where'd you go to college?
15   A.   I went to Augustana College, now Augustana University,
16        in Sioux Falls, South Dakota, focusing in mathematics
17        and physics.  After three years of attending, I had an
18        opportunity to transfer to either Columbia University,
19        in New York City, or Washington University, in
20        St. Louis, for another two-year period, studying
21        engineering, and at the end of five years both schools
22        grant four-year degrees.
23             So I completed the program at Washington
24        University, in St. Louis, with a bachelor's degree in
25        mechanical engineering, and also having received a
```

```
 1            bachelor of arts degree in mathematics and physics

 2            from Augustana College, now University.

 3    Q.      Where is Augustana College?

 4    A.      Sioux Falls, South Dakota.

 5    Q.      Oh, you just said that, okay.

 6    A.      Let me further preface, I grew up on a farm.  I've

 7            operated farm equipment.  I've operated new equipment,

 8            old equipment, well-maintained, poorly-maintained

 9            equipment.  So I have some experiential background in

10            terms of operating farm equipment, and still family

11            members participate in either operating equipment for

12            gainful employment or in the service industry, where

13            they're operating for service companies, or repair

14            companies, or dealerships.

15    Q.      Where did you grow up?

16    A.      Nebraska.

17    Q.      Was there a particular type of farm that you gained

18            your experience on, what type of crops, what type of

19            livestock?

20    A.      Dry land farming, corn, soybeans, wheat, alfalfa;

21            livestock, chickens, sheep, hogs, beef cattle.

22    Q.      Was your father a farmer?

23    A.      Yes.

24    Q.      How many acres, approximately, did he raise and farm?

25    A.      240.
```

DAHL, P.E., JERRY
08/21/2018                                                                    Page 34

```
 1          incident more recently?

 2     A.   No.

 3     Q.   And your title has stayed the same the entire time?

 4     A.   Yes.

 5     Q.   I understand from your CV that you are a professional

 6          engineer.   In what states do you have a license?

 7     A.   I have a license in Missouri, a license in Michigan,

 8          and a license in South Dakota.   I've previously held

 9          licenses in other states.

10     Q.   Are you a certified fire investigator?

11     A.   No.

12     Q.   Have you ever attended any training seminars on

13          investigation of fires?

14     A.   Yes.

15     Q.   Have they been provided by a particular organization?

16     A.   No.

17     Q.   Have you ever attended a NFPA fire investigation

18          seminar training session?

19     A.   No.

20     Q.   Are you familiar with the phrase NFPA?

21     A.   Yes.

22     Q.   And when I say NFPA 921, are you familiar with that

23          publication?

24     A.   Yes.

25     Q.   Do you have any other types of certifications or
```

```
 1   Q.   The portions that he provided, he's not here to

 2        testify.  Do you feel qualified and competent to offer

 3        those same opinions that he was providing to the

 4        report?

 5   A.   No.

 6   Q.   Okay.  If we get to a particular place where you feel

 7        like a certain opinion is something from Dr. Smith,

 8        can you tell me where those opinions are?

 9   A.   I believe so.

10   Q.   Okay.  And, in particular, it looks like he is a

11        certified fire investigator, he's a certified vehicle

12        fire investigator, and he's also a master automotive

13        technician.  Those are certifications or

14        qualifications that you don't possess, is that

15        correct?

16   A.   Correct.

17   Q.   So as far as investigating the cause of the fire and

18        certain aspects of the origin of the fire, are those

19        areas that you would have to leave to others to offer

20        those opinions?

21   A.   Yes.

22   Q.   As it pertains to this investigation, what was your

23        role, what were you providing to this report, just in

24        general?

25   A.   There was some general discussions with Dr. Smith in
```

```
 1            terms of the assignment.  Oftentimes, as assignments

 2            occur in the office, we speak within generalities,

 3            "Yesterday I went to look at this, yesterday I saw

 4            this, generally."  In drafting the report, there may

 5            have been some back and forth with Dr. Smith in terms

 6            of documentation relating to what's available to

 7            support the report.

 8                      Upon Dr. Smith's departure, then I

 9            completed the report.  So it would have been

10            finalizing the report.

11    Q.      Was there a reason why the two of you collaborated on

12            this investigation?

13    A.      Other than time and availability, not that I recall.

14    Q.      Did he have certain areas where he did not consider

15            himself an expert and he needed your assistance to

16            offer expertise in those areas?

17    A.      I don't believe so.

18    Q.      And then, vice versa, were there areas where he is an

19            expert that you may not be, and you needed his

20            assistance to offer opinions on those areas?

21    A.      His particular experience is certification in fire

22            investigation, something that I do not have.

23    Q.      Without him to offer testimony -- well, as we go

24            through the report, if there are areas or statements

25            in the report that are related to fire investigation
```

```
 1        where they would fall under his umbrella, feel free to

 2        let me know.  That's what we need to know, is where

 3        your expertise starts and stops and where his starts

 4        and stops, okay?

 5   A.   Yes.

 6   Q.   Do you consider yourself an expert in fire cause and

 7        origin?

 8   A.   No.

 9   Q.   Do you consider yourself an expert in fire dynamics

10        and how fires spread?

11   A.   No.

12   Q.   Do you consider yourself an expert in heat transfer

13        from one side of a material to another?

14   A.   No.

15   Q.   Do you consider yourself an expert in ignition

16        temperatures of particular types of materials?

17   A.   No.

18   Q.   Do you consider yourself an expert in the operation of

19        farming equipment?

20   A.   I don't know that there's a qualification for expert

21        farm equipment operator.  I've never seen such a

22        certification available.

23   Q.   I'm not necessarily --

24   A.   I do --

25   Q.   I'm sorry.
```

```
 1   A.   Those are old.

 2   Q.   Like sixties, seventies?

 3   A.   Seventies.

 4   Q.   And then the Generation II John Deeres, do you have

 5        any idea what years those would be?

 6   A.   Those are late seventies.

 7   Q.   But as far as whether the turbo on the T8.390 actually

 8        operates at a temperature to become red hot, you don't

 9        have knowledge?

10   A.   I don't have knowledge, specific knowledge.

11   Q.   And then as to other components of the exhaust system

12        on the T8.390, you wouldn't know whether they operate

13        red hot or not?

14   A.   I wouldn't know, but I doubt they do.

15   Q.   And, in fact, you don't know specific temperatures

16        that those components of the entire exhaust system

17        actually operate during full throttle?

18   A.   I do not.

19   Q.   Have you ever drafted warnings pertaining to the use

20        of heavy equipment?

21   A.   No.

22   Q.   Do you consider yourself an expert in the drafting of

23        warnings?

24   A.   No.

25   Q.   What about the drafting of safety instructions?
```

DAHL, P.E., JERRY
08/21/2018                                                        Page 48

```
 1    A.    No.

 2    Q.    What about human factors?

 3    A.    No.

 4    Q.    And when I say "human factors," you're familiar with

 5          that phrase in the litigation context, is that

 6          correct?

 7    A.    Yes.

 8    Q.    So you don't consider yourself an expert in how

 9          operators will interpret certain warnings, is that

10          correct?

11    A.    Correct.

12    Q.    And then how they actually will implement the

13          instructions that they are given on a day-to-day

14          basis, you wouldn't be an expert in that, either?

15    A.    Correct.

16    Q.    Have you personally seen the tractor that was involved

17          in this fire before?

18    A.    No.

19    Q.    You didn't do a field inspection or an inspection of

20          the unit following the fire?

21    A.    No.

22    Q.    Do you know if your colleague, Dr. Smith, did?

23    A.    Yes.

24    Q.    And are you relying, in part, on his observations at

25          those inspections?
```

DAHL, P.E., JERRY
08/21/2018                                                      Page 49

```
 1   A.   Yes.

 2   Q.   And would his observations be encapsulated in this

 3        report?

 4   A.   Yes.

 5   Q.   And to the extent that there are notes or memos

 6        drafted of his observations, those would be in the

 7        file that you're talking about?

 8   A.   Correct.

 9   Q.   Would he have sent you emails describing what he saw

10        or his thoughts?

11   A.   No.

12   Q.   Was there a reason why Dr. Smith went to the site or

13        the inspection of the unit and you did not?

14   A.   The assignment of our projects typically is a single

15        individual acting as the investigator.  So Dr. Smith's

16        assignment would have been for the investigation.  I

17        would have been assigned elsewhere.

18             So my assignment at the time of the

19        investigation was something other than follow

20        Dr. Smith.

21   Q.   So what was your role in the entire project from the

22        beginning?

23   A.   My role in the beginning was nothing.  My role in the

24        beginning was this was an assignment to Dr. Smith.  So

25        my involvement came as Dr. Smith was departing.
```

DAHL, P.E., JERRY
08/21/2018                                                    Page 50

```
 1    Q.   Okay, and that clarifies a lot.  I thought you were

 2         all working together the whole time, but it sounds

 3         like you're saying that you only became involved when

 4         Dr. Smith announced that he was departing, is that

 5         correct?

 6    A.   Correct.

 7    Q.   Okay.  When did you first hear about this fire and

 8         become involved?

 9    A.   First heard about the fire would have been

10         contemporary to the general assignment, again, because

11         there's office banter, "Hey, we have a project

12         involving whatever."  So my recollection is hazy at

13         that point in time, but, "Dr. Smith's going to

14         investigate a tractor fire."  That would have been my

15         first general knowledge of it.

16              Specific involvement, then, would have

17         fallen into June of 2018.

18    Q.   So the report is drafted July 19th, 2018, and your

19         involvement would have begun a month before that?

20    A.   Roughly.

21    Q.   So by June of 2018, Dr. Smith announced that he was

22         leaving the company, and somebody needed to pick up

23         the file?

24    A.   Yes.

25    Q.   And that person happened to be you?
```

DAHL, P.E., JERRY
08/21/2018                                                                    Page 51

```
 1   A.   Yes.

 2   Q.   Is there a particular reason why you picked it up as

 3        opposed to someone else?

 4   A.   I'm very good.

 5   Q.   Okay.  Was it in your area of expertise, or was there

 6        some reason why this one happened to fall to you,

 7        other than you being good?

 8   A.   I believe from my particular background of farming

 9        equipment, both in investigations here at Nederveld

10        and prior personal experience, it may have been

11        slotted for me.

12   Q.   So you haven't seen the tractor individually.  Have

13        you been to the location of where the tractor fire

14        occurred?

15   A.   No.

16   Q.   Have you spoken with any of the witnesses to the fire?

17   A.   No.

18   Q.   When you became involved in June of 2018, what was

19        your first task that you undertook?

20   A.   To make arrangements to meet with Dr. Smith and review

21        the status of the project, the report in progress, and

22        what needed to be completed to issue a final report.

23   Q.   How did you go about getting a download from Dr. Smith

24        of all the information that he had already gained in

25        his investigation?
```

DAHL, P.E., JERRY
08/21/2018                                                                    Page 55

```
 1    A.    I do not.

 2    Q.    Approximately how much time did you prepare -- let me

 3          rephrase that.

 4                    How much time did you spend looking at

 5          these file materials and gathering your thoughts

 6          before this report was drafted?

 7    A.    Zero, because the report was drafted before I assumed

 8          the project.

 9    Q.    So once you became involved, you were just finalizing

10          the report, is that correct?

11    A.    Correct.

12    Q.    Did you add any particular sections to the report?

13    A.    Yes.

14    Q.    In general, can you tell me which sections you added?

15    A.    On page 3, top of the page, second paragraph,

16          regarding the technical feasibility and production

17          practice for manufacturing, that particular paragraph

18          was my insertion.

19    Q.    Is it fair to say that the rest of the report,

20          although you may have edited and tweaked things, it

21          was the work product of Dr. Smith?

22    A.    Yes.

23    Q.    Do you agree with the remainder of the opinions and

24          the conclusions that are reached in the rest of the

25          report?
```

DAHL, P.E., JERRY
08/21/2018                                                            Page 69

```
 1          type of materials fall?

 2     A.   They fall at the lesser ignition temperature.

 3     Q.   So they'd have the lower end of that range?

 4     A.   Yes.

 5     Q.   Would you agree that for a surface to ignite material

 6          due to contact, the hot surface has to have a

 7          temperature that exceeds the ignition point of the

 8          material?

 9     A.   Can you repeat the question?

10     Q.   Sure.  In order for a hot surface to actually ignite

11          debris, would you agree that the hot surface has to

12          reach a temperature that's in excess of the ignition

13          temperature of the debris?

14     A.   No.

15     Q.   Okay, why not?

16     A.   You can have ignition from radiant heat, so it doesn't

17          have to touch the surface, and that radiant heat

18          accumulates.  So very much like focusing a magnifying

19          glass on a surface, the temperature around it remains

20          at room temperature, but that focus of radiant energy

21          accumulates to the point of ignition.

22               So that would be a non-contact ignition

23          from radiant heat.

24     Q.   So if the surface, the skin temperature of a

25          particular material reaches, let's just say X degrees,
```

```
 1          is it possible for the radiant temperature in the area

 2          to be higher than the X temperature of the surface?

 3   A.     Yes.

 4   Q.     Okay, in what context, or what would cause that to

 5          occur?

 6   A.     So in the radiant heat, what happens is you're

 7          applying energy to a surface, and that energy

 8          accumulates until it dissipates, and it can dissipate

 9          by conduction, by convection, by radiation itself.

10               Radiation is a poor means of removing heat.

11          So if I have something that is near in proximity to

12          this surface, and it's receiving radiant heat and it's

13          insulated, it will form a combustion pocket.

14   Q.     And what do you mean by a "combustion pocket"?

15   A.     The area around it is compacted and insulated, such

16          that the energy is focused in a particular area and

17          cannot relieve itself.

18               Does that make sense to you?

19   Q.     It does.  And so I guess I'm hearing you say that

20          because the energy --

21   A.     What happens is the surface is releasing energy.  It

22          has a surface temperature, let's say 500 degrees F,

23          okay?  It's also radiating heat as part of its heat

24          loss, heat transfer, okay?  So in that particular

25          case, what you can do is you can have a surface that's
```

```
 1            receiving radiant heat.  A sponge; so I have water

 2            attacking the sponge.  The sponge can reach the point

 3            where it's saturated and can't hold any more.  That's

 4            what I would call combustion.

 5                      So because of this radiant effect, you can

 6            have something that ignites where it's not in direct

 7            contact with that surface.

 8    Q.      So it will cause the temperature in that pocket to --

 9    A.      To elevate, because you're always adding energy to

10            that pocket.

11    Q.      Wouldn't that also cause the surface to become higher

12            in temperature, as well?

13    A.      Which surface?

14    Q.      The surface --

15    A.      The receiving surface?

16    Q.      -- that's radiating -- no, the providing or the

17            radiating surface.  If the energy -- for instance, in

18            this case we have an SCR canister, and it is emitting

19            heat or radiating heat, correct?

20    A.      Correct.

21    Q.      And if that heat cannot dissipate in the immediate

22            area around the SCR canister, wouldn't that also heat

23            up and cause the surface of the SCR canister to reach

24            a higher temperature?

25    A.      It could.
```

```
 1   Q.   And so do you still believe that in the context of the
 2        gap, a one-inch gap around an SCR canister, do you
 3        believe that the debris on the outside of the canister
 4        would reach temperatures higher than the surface of
 5        the SCR canister?
 6   A.   It could.
 7   Q.   Through the radiating process?
 8   A.   Through heat transfer, where the radiant heat flux
 9        overwhelms the ability for that debris to relieve
10        itself either through conduction, convection, or
11        radiation itself.
12   Q.   Now, you mentioned a magnifying glass as an example,
13        but that's a little different, right, because it's
14        bringing heat and it's pinpointing it into a
15        particular location, right?
16   A.   Not entirely, because what I'm offering with the
17        magnifying glass is everything around there is at
18        temperature, is at room temperature, and the radiant
19        flux through that area is at room temperature.  All
20        I'm doing is focusing that.  So I'm causing an
21        acceleration of the event, okay?
22   Q.   You're focusing the --
23   A.   The energy.
24   Q.   -- the flux that goes through the glass --
25   A.   Correct.
```

DAHL, P.E., JERRY
08/21/2018                                                          Page 75

```
 1            that right?

 2    A.      That's a possibility.

 3    Q.      You could have somebody dropping a cigarette butt

 4            along the side of the tractor that could cause that

 5            fire?

 6    A.      Yes.

 7    Q.      Okay.  So if the only evidence we have of the cause of

 8            the fire is that it started next to the SCR, can we

 9            agree that that evidence alone does not establish that

10            heat from the SCR ignited the debris either through

11            contact or through radiant heat?

12    A.      In only that context, yes.

13    Q.      Do you consider yourself an expert in evaluating and

14            reaching conclusions based on burn patterns?

15    A.      No.

16    Q.      Are you familiar with burn patterns?  Do you see them

17            in other cases?

18    A.      Yes.

19    Q.      If there is a V burn pattern, does that tell you

20            anything?

21    A.      Oftentimes, V patterns are used by fire investigators

22            to locate an origin.

23    Q.      But as far as interpreting those V patterns, you would

24            leave that to others?

25    A.      That's correct.
```

```
 1           design, you're talking about --
 2                    MR. ROBINSON:  Yeah, let me rephrase that.
 3    BY MR. ROBINSON:
 4    Q.     Have you identified any manufacturing defects in this
 5           particular unit?
 6    A.     No.
 7    Q.     And a manufacturing defect would be any deviations
 8           from the specifications of how it should be built as
 9           opposed to how it actually was built?
10    A.     Correct.
11    Q.     And you have not identified any of those?
12    A.     I have not.
13    Q.     Are you offering opinions today about the sufficiency
14           of the warnings and instructions that CNH provided to
15           its operators?
16    A.     No.
17    Q.     So you won't be testifying that CNH's warnings should
18           have included additional detail?
19    A.     No.
20    Q.     Do you believe that the warnings were sufficient to
21           instruct operators on how to appropriately clean this
22           tractor?
23    A.     No.
24    Q.     You do not believe they were sufficient?
25    A.     I don't.
```

```
 1    Q.   But you -- are you going to be offering that opinion

 2         in this case?

 3    A.   No.

 4    Q.   Okay.  Is there a reason why you're not offering that

 5         opinion, even though you hold that opinion?

 6    A.   I've not seen the particular vehicle itself, so I

 7         can't render that specific opinion.

 8    Q.   But you've seen --

 9    A.   From the photographs I've seen, obviously there was

10         crop debris still left within the vehicle.  So in

11         terms of instruction by the manufacturer to clean

12         particular areas or to expose particular areas, had

13         those instructions been followed, they were

14         incomplete.  Had they been followed, material still

15         resided in the vehicle.

16              So I'm not clear whether it's due to lack

17         of maintenance or improper instruction.  However, we

18         have an entrapment area that's available on the

19         vehicle, which is a design issue.

20    Q.   Okay.  Are you offering the opinion that the

21         instructions that CNH provided did not tell the

22         operator to clean that particular entrapment area that

23         you're describing?

24    A.   No.

25    Q.   And let me expand on that.  Mr. Wilson is testifying,
```

```
 1           or testified yesterday that CNH should have

 2           specifically told operators to make sure to clean in

 3           the area immediately around the SCR canister, and

 4           CNH's failure to specifically instruct about that area

 5           is a warning defect.

 6                    Do you hold that same opinion?

 7   A.   I don't have that opinion.

 8   Q.   So your opinion is there was debris on the tractor

 9           that has not been cleaned, but whether that was the

10           result of the operator not following instructions or

11           the instructions not being sufficient, you don't know?

12   A.   Correct.

13   Q.   Have you had a chance to review the instructions that

14           CNH does provide?

15   A.   Cursorily.

16   Q.   Are they part of your file materials?

17   A.   Yes, we would have that in electronic fashion.

18   Q.   And I think during the break you were going to look

19           for additional materials related to Dr. Smith's

20           investigation.  Were you able to find anything?

21   A.   Yes.

22   Q.   What did you locate?

23   A.   So I located the physical file, typically what we were

24           working with, and I found three documents which I've

25           copied for our purposes.  The first is a single-page
```

```
 1            increasing the temperature of the inside surface of

 2            the shield?

 3   A.       Yes.

 4   Q.       Do you know how much of a gap is between the shield

 5            and the canister surface itself?

 6   A.       Approximately two inches.

 7   Q.       Is that uniform all the way around the canister?

 8   A.       Not entirely, because there's convolutions within the

 9            fuel tank.  Let me offer, it does not appear to

10            intrude shorter than the two inches but extends

11            further than the two inches.

12   Q.       Okay.  So the closest the surface would be is two

13            inches?

14   A.       Yes.

15   Q.       Do you know what the melting temperature of the

16            surface of that shield would be?

17   A.       No.

18   Q.       And when I say "shield," I'm talking about the

19            component around the canister that can be removed to

20            expose the canister.  Are you familiar with that?

21   A.       Yes, but the canister also has an insulation shroud or

22            shield, also, as well.

23   Q.       Okay, so --

24   A.       So your discrimination is between the front protective

25            cover or the surrounding insulation blanket.
```

DAHL, P.E., JERRY
08/21/2018                                                                Page 105

```
 1   Q.   Okay.  So the canister has a blanket all the way

 2        around it or just in certain portions?

 3   A.   In certain portions.

 4   Q.   Where is that blanket?

 5   A.   The blanket is where it's facing the fuel tank, so on

 6        the bottom three sides.

 7   Q.   And what is that blanket composed of?

 8   A.   It's composed of a reflective panel and some fabric

 9        insulation and a fabric backing.

10   Q.   And does that, that blanket, does it actually touch

11        the canister itself?

12   A.   It may.

13   Q.   But the two-inch gap that you're talking about, you

14        believe that blanket's in that gap?

15   A.   Yes.

16   Q.   And it only encapsulates on the three sides that also

17        have the fuel tank?

18   A.   Yes.

19   Q.   So, in essence, it separates the canister from the

20        fuel tank?

21   A.   Yes.

22   Q.   What about the side that does not have the fuel tank

23        surrounding it or adjacent to the canister, is there

24        any kind of fabric or blanket there?

25   A.   No.
```

DAHL, P.E., JERRY
08/21/2018                                                              Page 112

```
 1   A.   Correct.

 2   Q.   The fuel tank ultimately did breach, but that was the

 3        result of an ongoing fire, fair?

 4   A.   Correct.

 5   Q.   Okay.  So the presence of the SCR next to the fuel

 6        tank is, although you may believe it's a

 7        less-than-optimal design, it didn't cause this fire?

 8   A.   Can you repeat the question?

 9   Q.   The presence of the SCR canister next to the fuel

10        tank, although you believe that less than optimal in

11        design, did not cause this fire?

12   A.   Correct.

13   Q.   So what is your defect theory as to the design that

14        actually caused this fire?

15   A.   The design defect is the entrapment area between the

16        SCR and the next available surface that does not

17        self-clean, and let me further refer to that in the

18        case of the front cover that we discussed earlier,

19        there is a gap under the cover facing groundways, such

20        that if debris would fall in front of the SCR, it can

21        fall through that area.

22             There's nothing to say that that fuel tank

23        that's encircling the SCR could not have had the void

24        space immediately beneath the SCR so there's nothing

25        for anything to accumulate upon.
```

```
 1   Q.   How much gap is between the blanket and the surface of
 2        the SCR?
 3   A.   Less than two inches.
 4   Q.   Do you know how thick the blanket is?
 5   A.   No.
 6   Q.   Have you looked at any design specifications for the
 7        blanket?
 8   A.   No design specifications have been provided.
 9   Q.   How do you know that there was a blanket that went
10        around that surface of the canister?
11   A.   I would have to assume so, because that's listed in
12        the parts diagram, and exemplar tractors in an
13        unburned condition have a similar blanket.
14   Q.   So your theory is that the gap between the surface of
15        the SCR and the blanket allowed for the accumulation
16        of debris that did not self-clean?
17   A.   Correct.
18   Q.   And you believe the fire did not start on the forward
19        side of the canister, but on the rear side of the
20        canister?
21   A.   Correct.
22   Q.   And maybe you've already answered this, but I just
23        want to make sure.  You can't say whether it started
24        as a result of the heat from the inlet pipe or heat
25        from the surface of the SCR?
```

DAHL, P.E., JERRY
08/21/2018                                                        Page 117

```
 1   Q.   So you would agree that:  At least once each day and

 2        at the end of the day, remove all trash and debris

 3        from the machine, especially around hot components

 4        such as the engine, transmission, exhaust, and

 5        battery, et cetera.  That's what it instructs, is that

 6        correct?

 7   A.   Yes.

 8   Q.   And then later it states:  More frequent cleaning of

 9        your machine may be necessary depending on the

10        operating environment and conditions.  That's the

11        instruction, correct?

12   A.   Yes.

13   Q.   And you don't have any criticism as to the frequency

14        with which CNH instructs operators to clean around hot

15        components.  Is that right?

16   A.   I do not.

17   Q.   And would you agree that the SCR canister is a

18        component of the exhaust system?

19   A.   Yes.

20   Q.   And so do you believe that the instruction here

21        adequately instructs operators to clean around the

22        SCR canister?

23   A.   No.

24   Q.   And in what way do you not agree with that?

25   A.   The SCR canister strung by the fuel tank presents an
```

DAHL, P.E., JERRY
08/21/2018                                                          Page 118

```
 1        entrapment area, that in the general revealing of the

 2        SCR canister by removing the front cover does not

 3        fully expose the entrapment areas, and with the

 4        entanglement obstruction interaction with the

 5        surrounding blanket may not readily clean from normal

 6        cleaning methods, and there may have been a further

 7        instruction, make sure you rake behind components,

 8        make sure you evacuate this particular ash pit or

 9        collection point to remove.

10                So the truly crude example is when my wife

11        tells me to clean the house and I'm done, she starts

12        over and does a different type of cleaning.

13                So when you say "clean the machine,"

14        kitchen clean or operating theater clean?  That

15        distinction is not here, and kitchen clean is removing

16        the chunks.  So removing the chunks may be sufficient

17        for cleaning.  That distinction is not offered in this

18        instruction.

19   Q.   And earlier I thought you were -- you testified that

20        you would not be offering any opinions as to the

21        sufficiency of the instructions or warnings.  Was I

22        mistaken earlier or ...

23   A.   You were not mistaken earlier.

24   Q.   Okay.

25   A.   Though I've offered it here.
```

```
 1            transfer?

 2    A.      The point at which the SCR canister does not exceed

 3            240 C would be a service that would be in proximity to

 4            where we believe the fire occurred.

 5    Q.      I'm sorry?

 6    A.      So let me offer an example.  As the test may be

 7            conducted to identify temperature point on the

 8            SCR canister, we can have crop debris that is in

 9            proximity, in contact or surrounding area, such that

10            the planned/designed/natural convection for the

11            SCR canister to relieve heat is impeded by the debris,

12            such that in a purest test, where the SCR is naked and

13            I can verify no temperature exceeds 240 C, but in the

14            event that I apply crop debris in the area, that that

15            impedes the airflow and I have temperatures reaching

16            300 C in that area, that's a different test, and that

17            would not be picked up by the first virgin test.

18                    So, yes, in fact, if in all conditions we

19            can verify through testing or documentation that even

20            with an overburden of crop debris no surface ever

21            exceeds 240, I would agree.  But without the benefit

22            of an impairment or a contaminant present, I can't

23            agree with that premise.

24    Q.      Now, in this particular model there is no

25            convection -- there's no airflow from the bottom up,
```

```
 1              is that right?

 2    A.        No.

 3    Q.        So --

 4    A.        There is airflow.

 5    Q.        But there's no airflow from the ground up through the

 6              bottom?

 7    A.        The platform terminates before the front cover.  So

 8              there is an open mail slot at the base of the front

 9              cover and the floor of the fuel compartment that

10              allows air to enter and convectively travel through

11              that compartment and up beyond the opening of the top

12              of the cover.

13    Q.        If there --

14    A.        Now, that convective current only sees the front of

15              the SCR, it doesn't travel behind it, because there's

16              a solid floor beneath it.

17    Q.        Okay.  So the back of the SCR that we're talking about

18              where you believe the origin of the fire was --

19    A.        Yes.

20    Q.        -- there's no airflow from that mail slot?

21    A.        Correct.

22    Q.        And there's no airflow from any other direction, is

23              that correct?

24    A.        Correct.

25    Q.        Okay.  So whether there's debris there or not is not
```

```
 1   A.   Yes.

 2   Q.   And did you eliminate that as a potential origin

 3        location?

 4   A.   Let me stop.  I am not a fire investigator.  I did not

 5        determine the origin.  In general observation of the

 6        progression of the fire in the video provided, as well

 7        as the examination of the artifact after the loss, the

 8        progression of the fire -- witnessing the fire in

 9        progress did not appear to have originated under the

10        cab in the transmission area.

11                  Once again, fire burns up and out.  And at

12        that point in time the fuel tanks were quite involved,

13        which is unusual for it to be burning up and out from

14        beneath the cab versus somewhere originating near the

15        isothermic SCR.

16   Q.   Okay.  Would it change your opinion if the first

17        observation of smoke in this case was coming from

18        under the cab?

19                  MR. CORETTI:  Assuming a fact not in

20        evidence, form of the question.

21   BY MR. ROBINSON:

22   Q.   Would it affect your opinion if the first observation

23        of smoke was coming from under the cab?

24   A.   No.

25   Q.   If the first smoke was coming from under the cab, you
```

```
 1        would you expect debris to accumulate in that

 2        vicinity, given the open mail slot on the front?

 3   A.   The mail slot is linear, goes along the front edge of

 4        the rectangular platform of the fuel tank.  So

 5        immediately at the front of the SCR, where that mail

 6        slot is open, I wouldn't expect any accumulation.  As

 7        the SCR is oval, then I would expect that as the ledge

 8        beneath the SCR is revealed, I can collect debris on

 9        those ledges.

10   Q.   So as it starts to turn around, sort of towards the

11        back of the tractor, that's where you would expect

12        there might be debris, sort of underneath of the

13        SCR -- or the inlet pipe?

14   A.   The diagram I provided earlier of the fuel tank from

15        Exhibit 28, on page 3 of Exhibit 28, I've drawn an

16        arrow to illustrate where the inlet pipe for the SCR

17        existed, and I see that the floor of the fuel tank

18        protrudes further forward from the centerline of that

19        pipe, which would provide a shelf extending forward of

20        the pipe that would be available to collect debris.

21   Q.   And in that location, where the debris would

22        accumulate in that location, there would be airflow

23        from the mail slot that would have prevented that

24        convection reduction, is that correct?

25   A.   Yes.
```

DAHL, P.E., JERRY
08/21/2018                                                          Page 214

```
 1   Q.   So the surface temperature of the inlet pipe on that

 2        side, you would not expect it to be elevated as a

 3        result of convection reduction?

 4   A.   Correct.  Back to your illustration in this

 5        Exhibit 38, we see the tractor frame rail to the right

 6        of the view, the inlet pipe as we're seeing

 7        progressing from the frame rail downward, that

 8        particular cavity and opening extending into the

 9        engine compartment is open.  There are no guards,

10        shrouds, or shields in this area.  So if a smoke event

11        is occurring within/near the area of the inlet pipe,

12        it can be aspirated into this area and travel beneath

13        the cab.

14   Q.   Okay.  If the wind was blowing from left to right,

15        would you have expected the smoke to emanate that

16        direction into the wind and up under the cab?

17   A.   It depends upon where the smoke traveled to, where if

18        it traveled beneath the cab and was entrained in the

19        cooling airflow, it could be pushed under the cab, and

20        then whichever way it's ventilating or leaving from

21        there, whether it's directed by the air stream outside

22        or not, I couldn't say.  That would have a greater

23        control of where the smoke would travel under the cab.

24   Q.   In your file you had a section of the Babrauskas

25        Ignition Handbook.  Do you know anything about this
```